Thank you. We will now hear the final case to be argued today. It's Richard v. Newsom. Good morning, and may it please the Court, Anna Barver for Appellant Richard and the rest. I'd like to reserve three minutes for rebuttal, if I may. This case is not about whether the government may regulate a licensed entity. It is about whether the government may require private parties to carry out a suspicionless government surveillance program on the government's terms at the private party's own expense. Section 26806 does just that. It requires firearms dealers, including those who operate within their very own homes, to install, operate, and maintain an audiovisual continuous surveillance for the state's sole use. That form of compulsion violates the Constitution in three distinct ways. First, it constitutes a continuous warrantless search without probable cause under the Fourth Amendment. It allows the government to physically commandeer private property for the government's use and purposes without compensation in violation of the Fifth Amendment. And finally, it substantially and predictably chills First Amendment speech and association. The District Court treated this case as one about pure, simple, ordinary regulation. It is not about that, and that error infected the District Court's analysis on all three constitutional claims. The judgment should be reversed. Turning first to the Fourth Amendment, the District Court had made two foundational errors in its analysis. First, it treated the only constitutionally relevant search as the later subsection B review of the FFL's written. May I ask you a question about the two plaintiffs who have home-based firearm federal licenses? So, Mr. Richards operates his firearm business out of a separate structure at his residence. But in that separate structure, he also operates his law office. And also, it says that his family visits him in the mornings and in the evenings, and his young children visit him in his home office in partial states of dress before bed. Is that correct? So it sounds like he is mingling his law business, his firearm business, and his family life in that separate structure, and it goes from morning to late into the evening? That's correct. The allegations of the complaint, I'm not exactly sure how close to his kitchen the home office is, but it is on his property. His family does visit him there, and the complaint does mention his young children. They come to him at night. They visit him in the morning and at night, so he's working around the clock, it sounds like. Is that correct?  Okay, all right. Let's also talk about Mr. Vandermulen, who also has a home firearm business. So he is doing it in his home. He's doing it both, seems like both online and in person. Is that correct? That's how I understand the allegations. Okay, all right. So that also, I mean, this one is less clear as to what, like with Mr. Richards, he's doing it morning and night. There's no limit on when he's doing it. He's doing it bedtime. He's doing it morning. What about Mr. Vandermulen? Is it, it's not really clear when he's doing it, but if he's doing it from his home, he could do it online, you know, in the middle of the night in his pajamas. He could, you know, wake up at 2 a.m. and do it. Like, it's not even limited at any time, right, when he's doing it. I'm not quite sure what Your Honor was referring to when you mean doing it. Do you mean engaging in the- Engaging in firearm sales. It's not clear what Mr. Vandermulen's actual business hours are. What's really common in what are called kitchen table FFLs, these are firearm dealers from their homes, is that they're in their homes doing firearm business, and it doesn't often look like your normal 9 to 5. These may be appointment-only businesses. But there's no allegation in, if I look at paragraph 11, I don't see anything about appointment only. That is- And I see, I thought he said he sometimes does things online. I could be wrong about that, but- It may not be- He says online. He says, Mr. Vandermulen operates a retail sales firearm business, an online firearm business named Mountain House Firearms. Right, it's not clear from the allegations of the complaint the exact hours that Mr. Vandermulen is engaged in firearms dealer conduct. However, he's in his home 24-7, and that's how this law operates. Okay, so we can assume that he may be engaging in his firearm business 24-7. It could be assumed, though that doesn't really make sense, and that's also not in the record. We weren't able to get beyond a motion to dismiss to determine what the actual hours of his business were. But again- But this is your complaint, right? You could have put those details in. This is your client. You could have asked him, what are your business hours? And that's not in there either for Mr. Richards or for Mr. Vandermulen, frankly. You would agree they're not in here. Yes, but again, it doesn't really matter what their exact hours are because this law is not limited to business hours. This law is 24-7. They have no business hours, right? They're, you know, Mr. Richards' kids in partial states of dress are going to him before they go to sleep. Anyway, you're conceding that the business hours are not identified for either Mr. Vandermulen or Mr. Richards in this complaint. I would concede that they're not identified and also that, again, it doesn't matter because this law is not limited to business hours. It is 24 hours a day, 7 days a week. Many people today work in home-based offices, and their children visit them where their businesses are. We're also talking about this case is an over-breath challenge for both the Fourth Amendment and the First Amendment in the way it affects not just Mr. Vandermulen and Appellant Richards but also other home-based FFLs. If this case had gotten into the discovery phase, we could have shown exactly what sorts of businesses are affected and how they are affected. But this is just the complaint stage, and we only need a plain, clear statement. The allegations of this complaint meet that bar. And the complaint doesn't say that any of the plaintiffs have actually been subject to an inspection for compliance with the statute, correct? I don't believe that the complaint shows that there has been an actual inspection. Okay. Regulatory inspection under Section A. This was early in the enforcement. A lot of this took place in the early months of the enforcement of the statute. Or that the state has actually viewed any of the recordings during a compliance inspection. The allegations don't talk about that. But again, under the Fourth Amendment, this doesn't matter because it is not simply the subsection B, regulatory inspection, that constitutes a search. That's actually the seizure. The search happens when the government-compelled, mandated 24-hour-a-day surveillance is happening. That's what constitutes the search. You're saying the moment the recording is turned on, that's the search. That's correct. Because it's government-compelled and because under Jones, it constitutes a trespassory search because it's government-mandated. It's a physical intrusion into private property for the express purpose of collecting law enforcement information for the government's purposes and only the government's purposes. And Carpenter goes beyond Jones and says that even though we may not have an actual physical intrusion, though a physical intrusion applies here by the government, it is the comprehensive recording of movements, conversations, and associations over time. Again, this law requires the collection of the same sort of detailed, deeply personal revealing information that is protected by the Fourth Amendment. Do you think that this statute authorizes an inspection? The statute does expressly authorize an inspection, but that's not the only constitution. Wait, it does? It does. Okay. And are you referring to, what is that, section B of 26-806?  Is that correct? Yes, that's correct. Okay. So it says a licensee, this is B, a licensee shall not use, share, allow access, or otherwise release recordings to any person except as follows. And A-1 says a licensee shall allow access to the system to an agent of the department or a licensing authority conducting an inspection of the licensee's premises for the purpose of inspecting the system for compliance with this section, and only if a warrant or court order would not generally be required for that access. Where does that authorize an inspection? Don't we have to look to another penal code statute to authorize the inspection? This just governs when the licensee can release, actually, that one doesn't even say release. It only says release in B-2 and B-3. B-1 just says when you allow access to a compliance inspector. So it's not even talking about release of recordings. But where in B-1 does it authorize, say, you know, the department may conduct an on-site inspection? I don't see that there. Don't we have to look at other penal code sections for the authority to do an inspection? I suppose, but I'm not sure how B-1 could mean anything other than giving, if you shall allow, if the FFL shall allow access, I'm not sure how the law doesn't give the government the authority to do so for the purposes of ensuring compliance with this section. And the district court recognized that that's exactly what this section does, and it used this exception to this subsection to suggest that this is a sort of administrative regulatory inspection that's okay under Berger, which it isn't, because this is not the search. But if I look at paragraph 37 of your amended complaint, you said California law allows California DOJ to conduct inspections of FFLs at least once every three years to ensure compliance with California firearm laws, and it cites other penal code sections. It doesn't cite 26806. I mean, even your complaint seems to acknowledge that you have to look at other penal code sections for the authority to conduct an inspection and not 26806, which is just telling when a licensee can give access to a recording to a compliance inspector or actually release the recordings pursuant to a search warrant or court order, which is B-2, or B-3, which is release the recordings as part of an insurance claim or some kind of civil discovery process in response to subpoenas, request for production, or court order. Okay, so California's laws with regard to the licensure and oversight of FFLs, both the state laws and federal laws, they're extensive. And sure, there are laws that are going to require access by FFLs to state inspectors. This subsection just makes very clear that's when FFLs shall comply, shall allow access, and for what purpose, because the statutory section you referenced in our complaint does talk about, in general terms, inspections for compliance with firearms laws in California. So I'm unclear. So I'm understanding that you're saying the moment the recording starts, that's the search. Yes. Are you claiming that any inspection, whether any recording is viewed or not, violates the Fourth Amendment? Any inspection, whether? Right. I mean, this statute has requirements about where the recording has to show, right? It has to show all areas where firearms are displayed, all points of sale, all entries and exits to the premises, that it has to be maintained for one year, the date and time has to be clear and accurate, it has to be stored in a secure manner. Clearly, there could be some inspections for compliance that wouldn't involve actually reviewing the recording, correct? No, because there's really no way to determine that the FFLs and surveillance is in compliance with all of those things. You have to have, I think it's 15 frames per second, continuous recording. You have to know that audio is being recorded. There's no way to do any of that without reviewing it. But if that inspection was during business hours, wouldn't that be permissible? The inspection may be permissible, but that is not the Fourth Amendment concern here. The Fourth Amendment concern here is government-mandated compulsory surveillance, the taking of the use of electronic audiovisual equipment to listen to people's conversations, to track their associations. Right, okay. Let's say we just hypothetically disagree with you that the moment of recording starts a search, okay? If we disagree with you on that, it seems that you concede that certain inspections during business hours would be valid, right? Not under this law, because in this law, it does not meet the burger. Even those inspections that give a limit based from subsection B1 and are approved by other subsections of the California Penal Code, even those regulatory searches are not limited because the surveillance is so deeply pervasive. I know. I'm saying put that aside. Put whether the 24-7 surveillance recording. I understand you're saying that is a search. That's not what I said. You're not saying that's a search? I'm saying that's a search. I have put that aside. What I'm saying is that is what is in those tapes. And so if the state is going to inspect those tapes and review them under subsection B1, it's getting all sorts of— But what says you have to review a historical tape? Can't you just turn it on and see at this moment when I'm sitting with you, does the frame rate exceed or is less than 15 frames per second? I don't see why anything says I have to look at historical recordings. I can look at whether the failure notification has been turned on or off without even looking at any of the recordings, and that's requirement 8, correct? But the statute doesn't limit it that way, right? The statute gives no limits on how the government is supposed to conduct these inspections. Right, and I understand you're saying there are scenarios where this inspection would be wrong, but I'm asking you a specific question about an inspection during business hours, right? An inspection that checks. Is the recording looking at exits and entrances of the premises where firearms are displayed and points of sale? You could just look at it at that moment to see if the frame rate is right, if it's displaying the date and time, if the failure notification trigger has gone off or not, right? You would concede that there are some inspections that would be permissible. I don't concede that. I think because of the deeply pervasive nature of this surveillance, regardless of how the government says it's going to limit its inspections, which the law doesn't have any limits on the way they conduct those inspections. Let me ask you about that. What about if audio wasn't being recorded? What if it was just video, like when you go to the bank or when you go gambling or you go to cannabis shops? What if it's just video and not audio? Does that make a difference? Of course I think that it would narrow the scope of the law, but it wouldn't eliminate the constitutional problem under the Fourth Amendment entirely. The Fourth Amendment does not permit continuous, suspicionless surveillance of audio, sorry, of even video monitoring of all customers as a condition of doing business, especially not as of a condition of engaging in constitutionally protected conduct, including going and talking about one's potential firearms purchases. There's no gun exception to the Fourth Amendment, or the First Amendment for that matter. Well, that's why I was asking if audio wasn't being recorded, then you're not going to be able to hear these conversations. You don't know what folks are talking about when they're purchasing their guns. But you do know that they are there, right? Because under the First Amendment, we're not only talking about speech protections, we're talking about speech protections of association. And Carpenter does talk about, Carpenter on the Fourth Amendment, shows that there's a search when we are getting deeply revealing information about folks' movements, and that can be discerned simply by video. And with regard to speech, I mean, First Amendment association, those associations can be discerned simply by video. But I mean, they're in a public space. They are going into a public space. I don't know how much they can assume that people aren't going to know that they went into a gun shop. This is not... But we do not take off our First and Fourth Amendment rights simply by going into public. Supreme Court precedents are clear about that. While there may be a diminished expectation of privacy, that doesn't mean there's no expectation of privacy. And this is an electronic permanent recording of one's association. That's not the same thing as you walking in and perhaps maybe there's a police officer around. Carpenter dealt with GPS. I mean, that's a whole different thing. That can tell you exactly where you've been all day. This is just when you walk into this public establishment. Carpenter, I think, is distinguishable here. Tell me why it's not. It's not distinguishable. Actually, because we can't put aside the fact that audio is taken, this is not simply paintings on cell phone towers about where someone's been. This is taking recordings of our speech, our conversations, our associations. And a lot of times... Let me follow up then. If we took out audio, is it okay? I don't think so, for the same reasons. It still shows all the movements inside of those businesses. And it's not just the protection of individuals who want to go in maybe a couple times a year. It's the employees that are there, the owners that are there all day long. Can you briefly address your First Amendment argument? I understand your point that 24 surveillance, especially the audio part, would have a chilling effect as a practical matter. But in our typical chilling effect cases, there always is involvement of government retaliation or the government will do something. There's a punishment here. So this is in kind of a weird situation. Can you address that? I don't think that's quite the proper understanding of chilling effect cases. Retaliation claims do require some sort of evidence or proof that there's going to be retaliation against folks. But chilling effect, the Supreme Court has recognized that compelled recording of conversations and associations in sensitive contexts, especially someplace like a gunshot, for instance, predictably and substantially chills protected speech. That's objective. It doesn't require retaliation. And I think the district court got that wrong in its First Amendment analysis. I mean, is there a particular case that that describes? I know they've definitely talked about chilling effect as a broader principle, but in kind of applying that law to the facts, typically it's involved some kind of government retaliation, punishment or something. Here it's a little bit different. And maybe just the nature of the 24 surveillances is enough. I don't know. But it doesn't fit squarely, at least based on the cases we have. I don't have the direct citation with me right now, but I do know that there's a distinction between retaliation cases and chilling effect. This is an objective. It's substantial. But some kind of punishment or something, that they fear some punishment will come from the government. Well, certainly that's what was alleged here. They do fear that retaliation, but I don't think it's required that they prove that to make a chilling effect allegation. I think you're over time unless either Judge Coe or Dale will have any questions. I know we took you over time because we asked a lot of questions. We'll give you two extra minutes on rebuttal. Thank you so much. Good morning, Your Honors. May it please the Court. I'm Ann Bellows, Deputy Attorney General for the State of California. I'm here representing Appellee Rob Bonta today. California adopted California Penal Code Section 26806 to deter and combat gun theft from firearms dealers, straw purchases, and illegal weapons trafficking. These are serious crimes, and they can have deadly consequences. I'm sorry to interrupt you. I just want to go ahead and get started. Do you think that Section 26806B1 authorizes compliance inspections? My understanding is more in line with what Judge Coe described earlier, which is that there are other California statutes that authorize those inspections. I would direct the Court to Penal Code 26900, 26720, and 16575 as some of those relevant statutory sections. And what B1 does is establish that when one of those preexisting inspections is taking place, the firearms dealer is required to make the system available to the inspector for the limited purpose of establishing that it complies with the statutory requirements of 26806. Can you tell me why audio is so important here? So the legislature made a judgment that audio would further efforts to fight and deter some of the crimes that are at issue. In particular, straw purchases and illegal gun trafficking prosecutions can sometimes turn on what representations were made, can sometimes turn on statements that were perceived during the event. And I would commend to the Court the Everytown amicus brief, which cites some of the cases that show how statements have been crucial to establishing criminal liability for those serious crimes. And so audio recording is a feature that's available in security cameras on the private market, and the California legislature wanted to make that standard so that, you know, under proper circumstances with the protections of a warrant or court order, that could be used for law enforcement. But most, you know, gun thefts, it's visual. Even straw purchases, they have to fill out forms. I mean, sure, can you get a little more extra information? Sure, if we put a camera on everybody 24-7, yes, you can get a lot more information. But it just seems the audio, whatever marginal benefits it provides, is so little, yet it's so invasive. Visual, I understand. You know, there's gun theft. You can ID a person who takes it. Someone submits a false, or a straw purchase false information and later claims that wasn't me, you can see it visual and say, nope, it was you who submitted this. But the audio, whatever, you know, in some, you know, extreme circumstances can provide additional information. Again, to overhear everyone's conversations. Well, the conversations that will actually be gathered up are only those for which there's a warrant or court order requiring a release. So the protections do come into play at the moment that the government seeks access to the recordings for those purposes. Suppose, hypothetical, we know some acts of Islamic terrorism. Some of the suspects have been radicalized at mosques. So could a state pass a law and say mosques should have 24-7 audio-visual surveillance for a year, maintain it? And if there's ever a crime and it's potentially linked to this mosque, the court will get a warrant to grab those tapes and view them and listen to them. I mean, do you think that would be invasive or do you think that would have a chilling effect on people who attend the mosque? I think that would be a deeply problematic statute. And I think it's very different from what we have here. So, you know, first off – And set aside free exercise. I'm talking about free speech or Fourth Amendment. Sure. So first off, I think that would raise grave concerns about discrimination on religious grounds, which are, of course, a whole separate area of doctrine. Okay. But in all religious, you know, maybe there's Christian nationalism, whatever you want to say. They put it in all religious institutions. And government will get a warrant to get those tapes. Okay. So I think the analysis of whether the requirement to install security cameras is a search really takes the court back to the first principles of whether it violates a reasonable expectation of privacy or whether there's a physical intrusion. Now, I can address the physical intrusion. I think that's a little different here. But it's quite clear that that would be much more likely to be a violation of congregants' reasonable expectation of privacy. Here – and that's a totality of the circumstances consideration. So what you're asking here is whether a gun dealer has a reasonable expectation of privacy in their business premises where under a host of regulations there is nothing private about a firearms transaction. It's something that must be extensively documented that is strictly regulated. So the government can require any business to record conversations 24-7 anywhere you are and they can record it. And as long as they can get a warrant later on because they suspect you of something, they can access that a year later? I mean, that is pretty chilling. Sure, but that's not what I'm saying with respect. What I'm saying is that you consider the circumstances of this particular requirement. And this particular requirement applies to gun stores, which are places where deadly weapons are sold. And it's a place where there has been thousands of thefts of deadly weapons. There's been – there's been – you know, there's suspected 30,000 straw purchases every year. And so there's a very particular – I'm so sorry. I just want to finish this. Sure, go ahead. Finish. There's a very particular regulatory environment that the state has created to safeguard society's safety to the best possible. And the result of that is a diminished expectation of privacy in those circumstances. I understand the visual part that addresses the state's concern. I think of people stealing guns, straw purchases. The audio is the one to me is the troubling because I don't think you need that information. The visual is the one you'll need. You know, when you see a most wanted list, you have physical description. It was a white male, six feet two. They don't say he had a deep, baritone voice. I mean, the audio one is the one that's so intrusive, and we really don't need that here. The legislature's judgment is that it did advance the goals. Yeah, but – and one thing is with gun shops. Also, there is a lot of core political speech that is involved. They allege and they complain, and that's true as a, you know, common sense matter. This is not, you know, auto shop where you're not going to have your conversation. You know, please fix my muffler. You go to gun shops, they have political materials, two-way materials, probably a lot of stuff that's very critical of your boss. Other political leaders, they talk politics and legal rights all the time, and it will have a chilling effect if they think the government can. You have a year's worth of everything you say, people will be deterred from saying things. Sure, but as the court has recognized, this is not a situation where the government just takes years' worth of data. There's very limited circumstances where the government can access that. And what we have in the First Amendment is a person of reasonable firmness test. So it's not just anything. You have to show that there's objective circumstances that would lead someone to believe that there could be a harm that results from their speech. And in this statute where there's, you know, very strict limits on access, very limited inspections, and the, you know, solely for the purpose of ensuring that the system meets statutory requirements, and you have all the protections of a court order or warrant to actually get a release of the recordings, there's no non-speculative harm that appellants can cite that could come to people as a result of their expression of views on the Second Amendment, on California officials. If I could just ask a quick follow-up question. Why isn't this a potential issue under our case law about the right to receive and exchange information, you know, the classic Lamont versus Postmaster General, that if the government makes it difficult to exchange information, receive information, that's a First Amendment violation? I'm sorry, could you, this is in the First Amendment chilling context that you're talking about. Yes, yes. You're referring to the case where the government was impounding materials. Yeah, they said, well, you just have to opt in, say, if you want communist materials. You just say, yes, I want it, and they'll deliver it. And the Supreme Court said, you know, okay, you can still get it, but that makes it a little more difficult, and the government's kind of inhibiting the free exchange of information, and that's one of the core protections of the First Amendment. So that goes beyond what's being imposed here. So in that case, the government was physically taking communications properties and withholding them until people came forward to claim them. That's really different than requiring gun dealers to install a piece of security equipment, which is actually common within the industry, and then safeguarding, you know, the recordings collected by the security camera by imposing strict limits on access. So I think there's a world of difference between the sort of burdens that are placed on people in order to come forward and actually receive a communication that go through several government-mandated steps, and one in which there's a security camera, which is a common experience. In fact, it's common in the firearms industry to have security cameras, and those, too, you know, could be the subject of a warrant or court order. It is. When private companies do it, it's fine. So when the government does it, it's different. And, I mean, as a practical matter, I mean, what would chill free exchange of information, just asking the postal service to say, yes, please give me this information, or knowing that your conversation is being, especially when you're talking about political matters, being recorded, everything you say, and held, and government could potentially access that for up to a year's worth. I mean, as a practical matter, it seems like 24 surveillance would have a bigger inhibition on the exchange of information than just filling out a form to the postal service, please give me that information. In the circumstances of this statute, I would disagree. I think the protections that are in place in California, Penal Code 26806, are quite extensive, and there's nothing that stops this conversation from taking place, you know, at a distance from the point of sale, at a distance from the firearms display cases. Maybe there's another room that's available for that sort of thing. If they want to have a training, they can have it at a distance from those points of recording that are strictly focused on the most sensitive moments in a firearm transaction and where, you know, these lethal weapons are being displayed. Are there any other laws in California or any other state that require 24-7 audio recording of private citizens who come to a place of business? Well, there are the cannabis business security camera requirements, which I believe are 24-7. But they don't have audio requirements. I don't have that at my fingertips, I'm sorry to say. I looked at it. They don't have an audio requirement in the cannabis. So that I'm able to relate to you today, no. But I think the California legislature had made a judgment that given the gravity of the straw purchase problem or the gravity of legal weapons trafficking, that additional tool, which again is available on the private market and there's no allegation it's not in the sorts of security cameras that are being used by firearms dealers today, that that would be, you know, part of the law enforcement benefit that they sought for the security camera. For the straw purchase prosecutions, you need mens rea, right? So you need some information about intent or knowledge. So the audio is critical for that perspective. That's correct. That's correct. And someone who just has a video could say, oh, I wasn't there to purchase. I was just accompanying my friend. My friend is the one who wanted it. And if you don't have the audio, you can't negate that for mens rea, correct? Absolutely. And on Rush v. Oblato, that actually challenged two statutes. And one of them, 1597.55e, says the unannounced visits may be made at any time. And Section 1596.852 says any duly authorized officer, you know, can enter and inspect any place providing personal care, supervision, and services at any time with or without advance notice to secure compliance with or to prevent a violation of any provision of this chapter. So in that case, they were actually challenging the statutes that authorized the unannounced inspections at any time. And this case is challenging a statute that doesn't authorize the inspection. So it may be a valid claim, but it's not targeting the right statute. Maybe there should be an amendment to challenge other statutes to actually get in the authorization of the inspections. That's correct. The statutes that govern the inspections provide quite a lot of guidance about when, who, for what purposes. And that's all well within sort of reasonable and certain rules that the Berger test has said are fine and fine substitute for the warrant requirement. But if the petitioners think they're not sufficient to satisfy the Fourth Amendment, they should be able to just amend their complaint and litigate the new sections that actually authorize inspections. Well, that would be a separate claim and one I don't understand them to make because it appears their concern is just an inspection of these recordings. And that is compliant with the Berger test for all the reasons that the district court described and which are laid out in our brief. I'd be happy to walk through that test if it's helpful. But I'd also like to touch briefly on Rashfield-Lito. But I guess I don't understand. If this is not the statute that authorizes the inspections, if we don't agree with the 24-hour surveillance, is the recording, is the search, then I don't understand how this is the correct statute to challenge. I would agree with that. You had mentioned several statutes that you think authorize those compliance searches. Do they have a limit on days or times that those searches can be effected? They can take place during business hours. Do you know which one it is? Yes. I do have some of those handy. Okay. So for the business hours, I would write the court to California Penal Code Section 26900. And then I would also direct the court to look at 11 California Code of Regulation Section 4022. I'll also say, in addition to the place of the complaint where some of these are mentioned, our brief does address this. I can't read the page number. I'm so sorry. And the district court addresses this at 1 ER 21 and 22. But the 26900, though, is limited to just firearm transaction record, right? Inspection doesn't give authority to the state to make any inspection? My understanding is that these all sort of happen as part of the same inspection. I'm just looking at the statute. It just refers to inspecting, quote, a firearm transaction record that's defined in Section 16550. So I don't think the government can search a gun dealer for compliance with the video requirement based on 26900, that this is only for firearm transaction records. Okay. So let me point you to the 11 CCR Section 4022, which I had cited, which says the DOJ, and this is not a direct quote but a paraphrase, that the DOJ may conduct on-site inspections to determine compliance with firearms laws. And then it cites a penal code section. And among the things that that regulation authorizes is access to all records, inventory, and security features, and requires the dealer to show and identify security measures and devices. The penal code section 16575, and I do recognize this is a very Byzantine set of statutes. I spent a lot of time navigating through it myself. 17, sorry, 16575, subsection 20, lists code sections 26600 to 29150 inclusive. And so 26806.  Can you repeat that set of numbers? Yes. I do apologize. So the regulation cites to firearms laws listed in penal code section 16575. Subsection 20 of that statute lists code sections 26600 to 29150 inclusive. And so that range encompasses 26806. Looking at California Code 11, section 422, it doesn't impose any limitations on the hours or days, does it? Sorry, not that I have in my notes. So I think the business hours, again, this comes because these are all addressed as part of the same administrative inspection. I think the business hours specification is in 26900. So you would say look at penal code 26900, 11 CFR 4022, and penal code 16575? Yes. And then look at subsection 20? Is there anything else that you would refer the panel to look at? What are there? So penal code section 26720 sets out the requirement to inspect firearms dealers at least every three years. And this includes the audited dealer records. I think it sort of links them all together. And then penal code section 28480 authorizes the DOJ to conduct on-site inspection to determine compliance with firearms laws. But what says they're all linked together? What do you look at for that? That 167575? I would concede that to me the statutory language is somewhat confounding, but my understanding is that's how it actually works in practice. There is an inspection scheduled by the Bureau of Firearms or, in some cases, a local authority if they meet the requirements. And during that inspection, they comply with all of these mandates. And those are scheduled inspections? So as to at-home dealers, those are scheduled inspections. As to brick-and-mortar retailers, my understanding is those may be unannounced. I do see that my time is up. I'd be happy to answer further questions. Great. Thank you. Thank you. I would first like to take just a few moments to first respond to Judge Lee's question about the First Amendment shilling authorities and whether or not we have to prove some sort of retaliation in order to or punishment to state a First Amendment shill claim. I would point the Court's attention to Arizona Students Association 824F3 at 868. That's where this Court recognizes that the government may chill speech not just by threatening or causing harm, but by prohibiting conduct or even sometimes conducting covert surveillance. I would think that obvious known surveillance would even be more chilling. And even the district court at 1ER9 had to acknowledge that a chill analysis did not require a showing of punishment. Simply a reasonable person would be chilled. I would like to then move quickly to just respond to a few things I heard my friend state. I think first, my friend argues that FFLs have no reasonable expectation in their firearms transactions and their business practices. And I think that gives away the argument, right? Because this law is not limited to firearms transactions and business practices. It's everything that happens within earshot or view of those cameras. And also, they talked about a particular regulatory scheme, but Section 26806 is neither particular or specific. You can't have probable cause against a single industry in perpetuity. And that's what Section 26806 does. And finally, I would like to mention that the state has not shown, has not proved or argued that any straw purchase or a legal firearm prosecution was unsuccessful for the lack of speech. And maybe we have to get there, but I don't think so. Because at the end of the day, when these ordinary regulatory things exist, like those on-site inspections, inventory audits, record-keeping transactions, when that exists, permanent total surveillance is not necessary under Berger. It just makes the government's criminal investigatory investigations more convenient. Thank you. Great. Thank you both for the helpful argument. The case is submitted, and we adjourn for the day. All rise. This court for this session stands adjourned.
judges: LEE, KOH, ALBA